United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JON GOLDBERG,

Petitioner,

v.

WARDEN RON BROOMFIELD,

Respondent.

Case No. 22-cv-02273-CRB

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Jon Goldberg ("Goldberg"), who is currently serving fifteen years to life in California's San Quentin State Prison for second-degree murder, petitions for a writ of habeas corpus under 28 U.S.C. § 2254. Pet. (dkt. 1).

Goldberg shot and killed a man, Tim Smith, who had an extramarital affair with Goldberg's wife. A California jury convicted Goldberg of second-degree murder. Goldberg challenged his convictions on direct appeal to no avail, and the California courts denied him postconviction relief. Goldberg now petitions this Court for a writ of habeas corpus, alleging that prosecutorial misconduct violated his right to due process and a fair trial, and that juror misconduct during deliberations violated his right to an impartial jury. As explained below, the Court DENIES the petition.

## I.    BACKGROUND

On February 15, 2018, the Humboldt County, California district attorney filed charges against Goldberg for murder under California Penal Code section 187(a), a personal gun-use enhancement under Penal Code section 12022.53(d), assault with a firearm under Penal Code section 245(a)(2), and misdemeanor brandishing a firearm under Penal Code section 417(a)(1)(B). Pet. ¶ 1. Following trial, the jury convicted Goldberg of

second-degree murder and the firearm enhancement.  Id. ¶ 2.  Goldberg filed a motion for a new trial, which was denied.  Id. ¶ 3.  On October 19, 2018, the trial court sentenced Goldberg to fifteen years to life in prison for second-degree murder but dismissed the firearm enhancement.  Id. ¶ 4.  Goldberg appealed.  Id. ¶ 5.  On November 13, 2020, the California Court of Appeal affirmed his conviction and sentence.  Id.; Ex. A (dkt. 1-1).

The Court of Appeal summarized the facts of the case as follows:

> At the time of the shooting, Goldberg and his wife, Rachel, were married for seven years and had a six-year-old son. The Goldbergs were friendly with Tim Smith and his domestic partner Jessica.  The day before the shooting, the Goldbergs went fishing and had dinner with Smith.  That night, Jessica discovered nude photographs of Rachel on Smith's phone and confronted Smith.  The next morning, Jessica sent Rachel a text message stating that she found the photos and that Rachel needed to tell her husband.  The shooting occurred later that day. Over the course of the morning, Rachel revealed to Goldberg that she had exchanged nude photos with Smith and had sex with him.  Goldberg was angry about the affair, cried intermittently, and drank shots of rum.
>
> Meanwhile, Goldberg exchanged a series of texts with Jessica.  He texted her that he would come see her.  Jessica texted Goldberg that she wanted to talk with him, then a few minutes later texted to say that he need not come and that she had "kicked Tim out so I don't know if he will be here."
>
> At some point while talking to Rachel, Goldberg retrieved a pistol, loaded it, and snapped it into a holster on his hip.  He fired gunshots into a tree that he occasionally used for target practice, then he reloaded the gun.
>
> Goldberg drove 50 minutes to a Verizon store to get a new phone because his was broken.  Although he did not usually carry a gun, he brought his gun with him, leaving it in the van while he was in the store.  When he was unable to get a phone, he drove home, where he saw that Rachel had left with their son. Goldberg next went to his neighbor Chad H.'s house, borrowed his phone to call Rachel, and screamed at her about sleeping with Smith and "kidnapping" their son.  Goldberg was angry and upset.  According to Chad H., Goldberg told him that Smith had slept with his wife and that he "was going to kill that motherfucker."
>
> When he returned home from Chad H.'s house, Goldberg immediately got in his van and drove to Smith's house.  His gun was still in his van.  Although Goldberg said he thought Smith would not be home, he recognized Smith's truck parked outside. After twice driving past his house, Goldberg parked behind Smith's truck.  The doors to the truck were open.  Goldberg took the gun from the floorboard of his van and clipped it to his side in the holster.
>
> As Goldberg got out of his van, he saw Smith emerge from the house and walk toward his truck.  Goldberg approached

Smith and said, "I thought you were my friend," then shot him multiple times from close range. Smith, who was unarmed, sustained five gunshot wounds—three shots to the chest and two shots toward the left side of his back. Four of the wounds were potentially fatal, and Smith died from his wounds.

A member of a work crew across the street testified that he saw a man "laying on the ground[]" as he was being shot, and he saw "dust blow out from underneath of him [with] each shot." Other than Goldberg, this was the only witness who claimed to have seen the shooting. Several witnesses who heard the shots testified that there was a pause between the first and second shots.

Goldberg testified at trial. Explaining the shooting, Goldberg testified that Smith "reached in his truck with both hands as you reach for a rifle." Goldberg pulled his gun out of the holster and held it up. Smith emerged from the truck unarmed and empty-handed, quickly stepped around the truck's open door toward Goldberg, and grabbed the hand in which Goldberg held the gun. Goldberg said he tried to pull his gun back but accidentally shot Smith in the center of his chest. He testified: "when I pulled back, the gun fired and I just kept firing." "I had my eyes closed as I pulled the trigger. When I opened them, he was falling to the ground." Goldberg testified that he felt terrified and believed, at the same time, Smith was trying to kill him.

Goldberg's primary defense was that he killed Smith in self-defense. Goldberg presented evidence that he believed that Smith would not be home; that he knew Smith kept guns in his truck; and that he believed Smith was reaching for a gun. The first shot was accidental, and he fired the subsequent shots because he believed his life was in danger. He also relied on an imperfect self-defense theory based on his genuine if unreasonable belief that Smith was threatening his life. A forensic psychologist testified that emotional distress can impair one's ability to accurately process information. Goldberg also denied telling Chad H. that he would "kill that motherfucker" but instead said he "should go kick that motherfucker's ass."
In support of a heat of passion theory, Goldberg asserted he was overcome by emotions after learning of his wife's affair with Smith. He presented evidence that he had a peaceful character and that he did not often shoot guns.

The People argued Goldberg did not act in self-defense or in the heat of passion but instead deliberately intended to kill Smith. The People also argued his self-defense claim failed because he purposefully initiated the confrontation with Smith and used more force than reasonably necessary.

People v. Goldberg ("Court of Appeal Opinion"), No. A155885, 2020 WL 6255513, at *1–2 (Cal. Ct. App. Oct. 23, 2020), modified on denial of reh'g (Nov. 13, 2020), review denied (Jan. 13, 2021).

Petitioner filed a petition for review with the California Supreme Court. Id. ¶ 6. On January 13, 2021, the Court summarily denied the petition. Id. Goldberg now seeks a writ

United States District Court
Northern District of California

1    of habeas corpus pursuant to 28 U.S.C. § 2254.

2    **II.    LEGAL STANDARD**

3            This court may entertain a petition for a writ of habeas corpus on behalf of a person

4    in custody pursuant to the judgment of a state court only on the ground that he is in

5    custody in violation of the Constitution, or the laws or treaties of the United States.  28

6    U.S.C. § 2254(a).

7            The writ may not be granted with respect to any claim that was adjudicated on the

8    merits in state court unless the state court's adjudication of the claim (1) resulted in a

9    decision that was contrary to, or involved an unreasonable application of, clearly

10   established federal law, as determined by the Supreme Court of the United States; or (2)

11   resulted in a decision that was based on an unreasonable determination of the facts in light

12   of the evidence presented in the state court proceeding.  Id. § 2254(d).

13           Under the "contrary to" clause, a federal habeas court may grant the writ only if the

14   state court arrives at a conclusion opposite to that reached by the Supreme Court on a

15   question of law, or if the state court decides a case differently than the Court on a set of

16   materially indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 412–13 (2000).

17   Under the "unreasonable application" clause, a federal habeas court may grant the writ

18   only if the state court identifies the correct governing legal principle from the Court's

19   decisions but unreasonably applies that principle to the facts of the prisoner's case.  Id. at

20   413.

21           "[A] federal habeas court may not issue the writ simply because the court concludes

22   in its independent judgment that the relevant state-court decision applied clearly

23   established federal law erroneously or incorrectly.  Rather, that application must also be

24   unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application"

25   inquiry should ask whether the state court's application of clearly established federal law

26   was "objectively unreasonable."  Id. at 409.

27           The only definitive source of clearly established federal law under 28 U.S.C.

28   § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time

United States District Court
Northern District of California

of the state-court decision.  Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).  While circuit law may be "persuasive authority" for determining whether a state-court decision unreasonably applies Supreme Court precedent, only the Supreme Court's holdings are binding on state courts and must be "reasonably" applied.  Id.

## III.    DISCUSSION

Goldberg petitions this Court for a writ of habeas corpus on two grounds.  First, Goldberg argues that several instances of prosecutorial misconduct at trial cumulatively and prejudicially violated his rights to due process and a fair trial.  Pet. at 10.  Second, Goldberg argues that juror misconduct during deliberations substantially and injuriously affected the verdict, denying him his constitutional right to an impartial jury.  Id. at 14. Goldberg raised each argument to the Court of Appeal, Answer Ex. 5 (dkt. 18) ("Pl.'s Br."), which ultimately denied him relief.  Court of Appeal Opinion.  As set forth below, the Court concludes that the Court of Appeal's rejection of Goldberg's claims was neither contrary to, nor an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1).  The Court also concludes that the Court of Appeal did not reject Goldberg's claims on an unreasonable determination of any facts considering the evidence presented at trial.  See id. § 2254(d)(2).  Therefore, the Court DENIES Goldberg's habeas petition.

### A.    Prosecutorial Misconduct

Goldberg claims that the prosecutor committed several instances of misconduct throughout his trial by using the word "murder" to describe the shooting pre-verdict and by mischaracterizing both the number of times and the position in which the victim was shot. Pet. at 10–14.  Goldberg also asserts that these instances of error cumulatively and prejudicially violated his right to due process and a fair trial.  Id.  As detailed below, the Court concludes that the Court of Appeal reasonably rejected Goldberg's claims of prosecutorial misconduct.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 1.    Court of Appeal Opinion

Because Goldberg raised each claim of prosecutorial misconduct on appeal,[1] the Court will first summarize the Court of Appeal's opinion.  See Court of Appeal Opinion at 5–11.

### a.    Use of the Word "Murder"

On appeal, Goldberg argued that the prosecutor "improperly described Smith's shooting as a 'murder' when questioning witnesses and in his closing argument."  Id. at 6. Goldberg also argued that his counsel's failure to object to the prosecutor's use of the word "murder" during closing arguments constituted ineffective assistance of counsel.  Id. at 7. The Court of Appeal rejected each claim in turn.

Although the Court of Appeal recognized that "prosecutor[s] should not use the term 'murder' when questioning witnesses," it did not find that the prosecutor committed misconduct on this basis.  Id.  (citing People v. Price, 821 P.2d 610, 703 (Cal. 1991)).  The Court of Appeal first determined that the prosecutor did not commit misconduct by using the word "murder" when questioning witness Steve S.  Id.  At trial, Steve S. admitted that he had told police that Goldberg had said to him, "Dude, I just murdered somebody," but later testified that Goldberg said that he had "shot" someone instead.  Id. (cleaned up).  As the Court of Appeal reasoned, the prosecutor used the word "murder" to ask Steve S. about this inconsistency, which did not constitute misconduct.  Id.  Similarly, the Court of Appeal also declined to find misconduct where the prosecutor used the word "murder" when questioning two additional witnesses who also used the word, because "[t]estimony by witnesses cannot be misconduct by the prosecutor."  See id. (citing People v. Thomas, 828 P.2d 101, 128 (Cal. 1992)).  Finally, the Court of Appeal held that Goldberg had

---

[1]  Goldberg raised two additional claims of prosecutorial misconduct in his appeal to the Court of Appeal that are absent from his federal habeas petition.  To start, Goldberg argued that the prosecutor "aggravated the references to murder by improperly disparaging the defense in closing argument."  Court of Appeal Opinion at 8.  Moreover, Goldberg argued that "the prosecutor improperly waited until his rebuttal argument to assert that Goldberg could not establish self-defense because he initiated the confrontation, and his self-defense was contrived."  Id. at 10.  The Court notes that the Court of Appeal did not find misconduct in either instance, see id. at 8, 10, but does not review them in this order.

procedurally defaulted on his claim of misconduct where the prosecutor asked a witness about their call to police about a "murder" because he failed to object at trial.[2] Id. at 6–7.

The Court Appeal did not find any reasonable probability of prejudice where the prosecutor said "murder" "more than a dozen times" during his closing argument. See id. at 7–8. Though the Court of Appeal assumed that the prosecutor's use of "murder" at this time was improper, id. at 7, it determined that the "context of the prosecutor's arguments, together with the trial court's instructions and admonitions to the jury," showed that the defense counsel's failure to object did not prejudice Goldberg. Id. at 7–8. As the Court of Appeal explained, the prosecutor reiterated that the jury was to decide whether the shooting satisfied the elements for murder; the prosecutor also used neutral terms like "killing" and "shooting" during his closing argument; the trial court provided three admonitions that made clear that "the jury should decide the case based on the evidence"; and the trial court provided "extensive instruction" about the jury's role and the elements of murder. Id. at 7. As a result, the Court of Appeal concluded that Goldberg did not receive ineffective assistance of counsel, and subsequently indicated that this misconduct claim was procedurally defaulted for failure to object.[3] See id. at 7–8, 11 ("Even if the prosecutor erred by describing Smith's killing as a 'murder,' . . . we find no cumulative prejudice because Goldberg failed to preserve the issues by objecting.").

### b. Mischaracterizations and Misstatements of Evidence

Goldberg next asserted that the prosecutor "committed prejudicial misconduct by arguing to the jury that Smith fell to the ground before Goldberg fired the final shots into his back and by misstating the evidence concerning the number of shots to Smith's back." Id. at 8. The Court of Appeal rejected each instance of alleged misconduct. Id. at 8–10.

The Court of Appeal held that the prosecutor did not commit misconduct by arguing

---

[2] The Court of Appeal did not reach the merits of this alleged instance of prosecutorial misconduct. Court of Appeal Opinion at 6–7.

[3] But as discussed in Part III.A.2.a., the Court of Appeal's opinion is ambiguous in its finding of procedural default for failure to object to the prosecutor's use of "murder" during closing arguments. See id. 7–8, 11.

United States District Court
Northern District of California

that Goldberg fired his final shots when Smith was on the ground because the prosecutor reasonably inferred Smith's position based on the evidence presented at trial. Id. at 9. As the court explained, the evidence that could have supported such an inference included: (1) a witness who testified that he saw Smith lying on the ground and "dust flying out from under him as the bullets were going through"; (2) additional witnesses who testified that there was a pause after the first or second shots but before Goldberg fired additional shots; and (3) Smith had a bruise on one shoulder and entry wounds on his chest and back. Id. Goldberg attempted to discredit this evidence by pointing out that no bullets exited Smith's body and, thus, argued that Goldberg's shots could not have caused the dust the first witness saw. Id. However, the Court of Appeal was unpersuaded. Even if the witness was mistaken about the source of the dust, no evidence (except Goldberg's testimony) contradicted the fact that the witness saw Smith on the ground as Goldberg shot him. Id. Notwithstanding a lack of evidence detailing Smith's position as he was shot, or how he acquired the bruise on his shoulder, the "prosecutor's contentions were based on arguable inferences from the evidence." Id. In addition, the Court of Appeal noted that it was for the jury to decide whether the prosecutor's inference was persuasive and that the trial court properly reminded jurors not to consider argument as evidence. Id.

    The Court of Appeal acknowledged that the prosecutor misstated the evidence by asserting that Smith had been shot four times in the back both when questioning Goldberg and during closing arguments. Id. at 10. However, the Court of Appeal determined that Goldberg had procedurally defaulted on this claim because his counsel failed to object at trial. Id. Even so, the Court of Appeal still considered the merits of Goldberg's claim and rejected it on two grounds. First, the trial court "repeatedly instructed the jury" that attorneys' statements are not evidence and that they should rely on their recollections and notes. Id. Second, Goldberg's counsel disputed this assertion during trial and walked the jury through contradictory evidence. Id.

### c.      Cumulative Effect

    Given its previous conclusions, the Court of Appeal concisely rejected Goldberg's

United States District Court
Northern District of California

1   assertion that the alleged acts of misconduct cumulatively violated his rights to due process

2   and a fair trial:

3           We reject Goldberg's argument that the alleged errors
            cumulatively violated his rights to due process and a fair trial.
4           With respect to cumulative prejudice, "[w]e consider [] only
            the misconduct to which objection was made in assessing
5           whether notwithstanding the admonitions given the impact was
            such that reversal is required."  [People v. Bell, 778 P.2d 129,
6           150 (Cal. 1989)].  Even if the prosecutor erred by describing
            Smith's killing as a "murder," and by misstating the number of
7           shots fired into Smith's back, we find no cumulative prejudice
            because Goldberg failed to preserve the issues by objecting.
8
            In short, the trial court did not abuse its discretion by
9           denying Goldberg's motion for a new trial based on
            misconduct by the prosecutor.
10

11  Court of Appeal Opinion at 11.

12          **2.      Analysis**

13          Goldberg argues that, in combination, the prosecutor's repeated and improper

14  referrals to the shooting as a "murder" and mischaracterizations of evidence throughout

15  trial violated his rights to due process and a fair trial.  Pet. 10–14.  Respondent counters

16  that the Court is barred from considering three instances of alleged prosecutorial

17  misconduct due to procedural default.  Answer at 8–9.  Respondent also asserts that each

18  alleged instance of procedural misconduct—individually and collectively—fails on the

19  merits because the Court of Appeal's assessment of Goldberg's claims was neither

20  contrary to, nor an unreasonable application of, clearly established federal law.  Id. at 9–

21  17.

22          The Court will first address the issue of procedural default before analyzing the

23  merits of Goldberg's prosecutorial misconduct claims.

24          **a.      Procedural Default**

25          Respondent contends that the Court may not review the following alleged instances

26  of prosecutorial misconduct because the Court of Appeal found them procedurally

27  defaulted for failure to object at trial: (1) the prosecutor's use of the word "murder" when

28  questioning a witness about their call to the district attorney's office; (2) the prosecutor's

United States District Court
Northern District of California

9

1   use of the word "murder" during his closing argument; and (3) the prosecutor's incorrect

2   assertion that Smith had been shot four times in the back both when questioning Goldberg

3   and during his closing argument.  Answer at 8.  Goldberg acknowledges the forfeiture of

4   his claims regarding the prosecutor's misstatements about the number of times the victim

5   was shot in the back, and cumulative error.  Pet. at 12; Traverse (dkt. 21-1) at 1.  However,

6   Goldberg does not address the procedural default of his remaining claims.[4]  See Pet.;

7   Traverse.

8          A federal court will not review questions of federal law decided by a state court if

9   the decision also rests on a state law ground that is independent of the federal question and

10   adequate to support the judgment.  Coleman v. Thompson, 501 U.S. 722, 729–30 (1991).

11   "For a state procedural rule to be 'independent,' the state law basis for the decision must

12   not be interwoven with federal law."  La Crosse v. Kernan, 244 F.3d 702, 704 (9th

13   Cir.2001) (cleaned up).  To be adequate, the state procedural rule "must have been 'firmly

14   established and regularly followed' by the time as of which it is to be applied."  Fields v.

15   Calderon, 125 F.3d 757, 760 (9th Cir. 1997) (quoting Ford v. Georgia, 498 U.S. 411, 424

16   (1991)).  Where a state prisoner has defaulted on federal claims in state court pursuant to

17   an independent and adequate state procedural rule, federal habeas review of the claims is

18   barred unless the prisoner can demonstrate cause for the default and actual prejudice

19   because of the alleged violation of federal law, or demonstrate that failure to consider the

20   claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 750.

21          When the California Supreme Court denies a petition on the merits and as

22   procedurally barred, the claims raised in that petition are procedurally barred if the cited

23   procedural bar is an independent and adequate state ground for decision.  See Bennett v.

24   Mueller, 322 F.3d 573, 580 (9th Cir. 2003) ("A state court's application of a procedural

25   rule is not undermined where, as here, the state court simultaneously rejects the merits of

26   the claim.").  But "[t]he state court must 'clearly and expressly state[ ] that its judgment

United States District Court
Northern District of California

---

[4]  Goldberg also does not attempt to overcome the procedural default of his claims in his federal petition.  See Pet.

rests on a state procedural bar' in order for federal review to be precluded." Thomas v. Hubbard, 273 F.3d 1164, 1176 (9th Cir. 2001) (quoting Harris v. Reed, 489 U.S. 255, 263 (1989)), overruled on other grounds by Payton v. Woodford, 299 F.3d 815, 828–29 n.11 (9th Cir. 2002); see also Zapata v. Vasquez, 788 F.3d 1106, 1111–12 (9th Cir. 2015) (finding federal habeas review precluded where "the state court expressly invoked a procedural bar in addressing [the petitioner's] prosecutorial misconduct claim"). If a federal court concludes that an asserted procedural bar was not an independent and adequate ground for the state court decision, the federal court must consider the claim on the merits; if the state courts never reached the merits of the claim, the federal court reviews the claim de novo. Pirtle v. Morgan, 313 F.3d 1160, 1167–68 (9th Cir. 2002).

The Ninth Circuit has recognized and applied the California contemporaneous objection rule in affirming denial of a federal petition on grounds of procedural default where there was a complete failure to object at trial. See, e.g., Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005). California's contemporaneous objection rule forecloses review even where the state high court went on to address petitioner's claim on the merits. Fauber v. Davis, 43 F.4th 987, 1002 (9th Cir. 2022) (citing Harris, 489 U.S. at 264 n.10 (1989)).

Here, the Court concludes that three of the alleged instances of prosecutorial misconduct are procedurally barred on federal habeas review for failure to object. See Answer at 8; see also, e.g., Inthavong, 420 F.3d at 1058 (affirming the denial of federal habeas due to procedural default where the California contemporaneous objection rule was not satisfied).

The Court of Appeal explicitly stated that it found Goldberg's claim of misconduct regarding the prosecutor's use of the word "murder" when questioning a witness about their call to the district attorney forfeited for failure to object at trial. See Court of Appeal Opinion at 6–7 (citing Price, 821 P.2d at 682) ("And while the prosecutor did ask a witness about his call to the [district attorney] regarding a 'murder,' Goldberg's counsel failed to object."); see also Zapata, 788 F.3d at 1111–12. Because the Court of Appeal did not

11

1   reach the merits of this claim, see Court of Appeal Opinion at 6–7, there is little doubt that

2   it independently rested its judgment on defense counsel's failure to object. See Coleman,

3   501 U.S. at 729–30. Thus, the Court is barred from reviewing this claim. See Inthavong,

4   420 F.3d at 1058.

5        Whether the Court of Appeal independently relied on a procedural bar to deny

6   Goldberg's claim of prosecutorial misconduct where the prosecutor used the word

7   "murder" during his closing argument is less clear. See Court of Appeal Opinion at 7–8.

8   In its opinion, the Court of Appeal focused on assessing whether the prosecutor's use of

9   the word prejudiced Goldberg and constituted ineffective assistance of counsel, a claim

10  that Goldberg raised on appeal to avoid forfeiture. See id.; Pl.'s Br. at 45. After denying

11  Goldberg's ineffective assistance of counsel claim for lack of prejudice, the Court of

12  Appeal indicated that the underlying prosecutorial misconduct claim was procedurally

13  defaulted. See Court of Appeal Opinion at 7–8, 11 ("Even if the prosecutor erred by

14  describing Smith's killing as a 'murder,' . . . we find no cumulative prejudice because

15  Goldberg failed to preserve the issues by objecting."). Although the Court of Appeal was

16  not crystal clear about its independent reliance on counsel's failure to object in rejecting

17  Goldberg's claim in this instance, as other courts in this District have held in similar

18  circumstances, "it [said] enough to indicate that forfeiture was, at a minimum, assumed."

19  See Davidson v. Arnold, 16-CV-03298-JD, 2020 WL 1332096, at *5 (N.D. Cal. Mar. 23,

20  2020). Consequently, the Court finds that Goldberg's allegation of misconduct based on

21  the prosecutor's use of the word "murder" during closing arguments is procedurally

22  barred. See id.; Zapata, 788 F.3d at 1111–12.

23        Lastly, the Court of Appeal explicitly determined that Goldberg's claim of

24  prosecutorial misconduct based on the prosecutor's misstatements of the number of times

25  the victim was shot in the back—both when questioning Goldberg and during his closing

26  argument—was forfeited for failure to object at trial. See Court of Appeal Opinion at 10

27  ("Goldberg did not object and thus failed to preserve the error for appeal."), 10 n.2

28  ("Likewise, by failing to object in trial court, Goldberg forfeited his claim that the

United States District Court
Northern District of California

prosecutor committed misconduct in implying when questioning Goldberg that Smith was shot four times in the back.").  The Court of Appeal then alternatively rejected Goldberg's claim on the merits.  See id. at 10.  Despite this merits analysis, the Court is precluded from reviewing these alleged instances of misconduct because the Court of Appeal independently reached its judgment according to an adequate procedural bar (failure to object at trial).  See Fauber, 43 F.4th at 1002.

Accordingly, the Court is procedurally barred from reviewing three of Goldberg's alleged instances of prosecutorial misconduct: (1) the prosecutor's use of "murder" when questioning a witness about their call to the district attorney's office; (2) the prosecutor's use of "murder" during his closing argument; and (3) the prosecutor's incorrect assertion, when questioning Goldberg and during closing arguments, that the victim had been shot four times in the back.  However, because the Court of Appeal's opinion is not crystal clear about its independent reliance on a procedural bar to reject Goldberg's claim concerning the prosecutor's use of the word "murder" during closing arguments, see Court of Appeal Opinion at 7–8, 11, the Court will address the merits of this claim in the following section.  See Thomas, 273 F.3d at 1176.

### b.    Merits

The Court now turns to the merits of Goldberg's prosecutorial misconduct claims.  The Court concludes that the Court of Appeal neither contradicted nor unreasonably applied clearly established federal law in holding that (1) the prosecutor's use of the word "murder" several times pre-verdict did not constitute misconduct or prejudice Goldberg; (2) the prosecutor's mischaracterizations and misstatements of evidence during trial did not constitute misconduct or prejudice Goldberg; and (3) the alleged errors did not cumulatively prejudice Goldberg.  See Court of Appeal Opinion at 5–11; see also 28 U.S.C. § 2254(d).  Moreover, even if Goldberg was denied due process due to cumulative prosecutorial misconduct, the prosecutor's actions did not have a substantial and injurious effect on the jury's verdict, given the evidence in this case.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court proceeds by summarizing the law governing its review of Goldberg's prosecutorial misconduct claim, and analyzes each alleged instance of prosecutorial misconduct in turn.  After determining that no instance of alleged prosecutorial misconduct rendered his trial fundamentally unfair, see Darden v. Wainwright, 477 U.S. 168, 181–82 (1986), the Court addresses Goldberg's claim that the alleged instances of misconduct cumulatively and prejudicially denied him his rights to due process and a fair trial.  See Pet. at 13–14.

### i.      Governing Law

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair.  Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis fin cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005); see also Deck v. Jenkins, 814 F.3d 954, 978 (9th Cir. 2016) (recognizing that Darden is the clearly established federal law regarding a prosecutor's improper remarks for AEDPA review purposes).  A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995); see Trillo v. Biter, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

The key factor in determining whether misconduct amounted to a violation of due process is whether the trial court issued a curative instruction.  When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred.  See Trillo, 769 F.3d at 1000 ("We presume that juries listen to and follow curative instructions from judges.").  This presumption may be

overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant.  See Greer v. Miller, 483 U.S. 756, 766 n.8 (1987).  In cases involving prosecutorial misconduct based on improper remarks at closing, any risk of prejudice can be mitigated by the issuance of a curative instruction that immediately follows and focuses upon such remarks.  United States v. Barragan, 871 F.3d 689, 709 (9th Cir. 2017) ("A curative instruction can neutralize the harm of a prosecutor's improper statements if it is given immediately after the damage [is] done and mentions the specific statements." (cleaned up)).

Additional factors that a court may take into account in determining whether prosecutorial misconduct rises to a level of due process violation include: (1) the weight of evidence of guilt, compare United States v. Young, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) with United States v. Schuler, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because governments case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, see Darden, 477 U.S. at 182.

Even where a prosecutor's conduct renders a trial fundamentally unfair, federal habeas relief is in order only if the denial of due process based on prosecutorial misconduct had a substantial and injurious effect or influence in determining the jury's verdict.  See Brecht, 507 U.S. at 637.  Petitioners are only entitled to habeas relief based on trial error if they establish that it resulted in "actual prejudice."  Id.

> **ii.    The Prosecutor's Pre-Verdict Use of the Word "Murder"**

15

Goldberg argues that the Court of Appeal unreasonably concluded that the prosecutor's repeated pre-verdict use of the word "murder" did not constitute prejudicial misconduct.  Pet. at 11.  According to Goldberg, these errors contributed to his denial of due process and a fair trial.  See id.  Respondent counters that the Court of Appeal appropriately rejected Goldberg's claims.  Answer at 10.  In the following paragraphs, the Court considers the prosecutor's use of the word "murder" when questioning witnesses and then reviews the prosecutor's use of the word during closing arguments.  Ultimately, the Court holds that the Court of Appeal reasonably concluded that the prosecutor's repeated use of the word "murder" during trial, while at times inappropriate, did not violate Goldberg's due process rights by rendering his trial fundamentally unfair.  See Darden, 477 U.S. at 181.

### (i)      Questioning Witnesses

The Court first addresses the prosecutor's use of the word "murder" when questioning witness Steve S., Goldberg, and two additional witnesses.  Improper questioning of a witness is not alone sufficient to warrant reversal.  Rather, courts must determine whether the prosecutor's behavior so infected the trial with unfairness to make the resulting conviction a denial of due process.  See Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998).  In considering whether the questioning deprived the defendant of a fair trial, courts review the witness's entire testimony to determine the impact of the improper questioning.  See id. at 934–35.

The Court of Appeal reasonably concluded that there was no misconduct where the prosecutor used the word "murder" when questioning witness Steve S., Goldberg, and two additional witnesses.  See id.  Goldberg argues that "it [is] improper for a prosecutor to use the term 'murder' in questioning a witness about an unadjudicated killing."  Pet. at 11 (quoting Price, 821 P.2d at 479–80).  But as the Court of Appeal explained, when questioning Steve S. and Goldberg, the prosecutor merely used the word "murder" to clarify what Steve S. had previously told police—that Goldberg told him that he had "murdered somebody."  See Court of Appeal Opinion at 6; Trial Tr. Vol. 4 (dkt. 15-3) at

894–95; Trial Tr. Vol. 6 (dkt. 16-1) at 1440–41.  Moreover, the Court of Appeal reasonably concluded that it was not misconduct for the two additional witnesses to use the word "murder" in response to the prosecutor's questions.  See Court of Appeal Opinion at 6; Trial Tr. Vol. 2 (dkt. 15-1) at 311 ("And she had told me . . . [Goldberg] shot and murdered [Smith], and [Smith] was dead."); Trial Tr. Vol. 3 (dkt. 15-2) at 598 ("I was around my house, . . . [j]ust doing, I guess, the murder routine.").

Even if the Court of Appeal erred in finding that the prosecutor did not commit misconduct when questioning these witnesses, any misconduct did not so infect the trial with unfairness that it violated Goldberg's right to due process.  See Darden, 477 U.S. at 181.  The prosecutor did not misstate or manipulate evidence.  See id. at 181–82.  While the prosecutor said the word "murder" seven times as he questioned Steve S., four of those instances occurred in an isolated segment of a lengthy examination in which he attempted to clarify Steve S.'s prior statements to police.  See Trial Tr. Vol. 4 at 894–95.  The prosecutor merely referred to the case as charged when using the word three other times during Steve S.'s testimony.  See Trial Tr. Vol. 4 at 884–85, 903.  The prosecutor's use of the word "murder" while cross-examining Goldberg was even more fleeting—he used the word only three times when asking Goldberg about Steve S.'s prior statements.  See Trial Tr. Vol. 6 at 1440–41.  Additionally, the trial court sustained defense counsel's objection and struck from the record one witness's use of the word "murder" in response to the prosecutor's question.  See Trial Tr. Vol. 2 at 311.  The trial court also instructed the jury that "nothing the attorneys say is evidence" and that "their questions are not evidence" multiple times.  See, e.g., Trial Tr. Vol. 6 at 1542.  Although these instructions did not immediately follow the prosecutor's use of "murder," see id., the Court presumes that the jury adhered to them.  See Trillo, 769 F.3d at 1000.   Finally, and as outlined in Part III.A.2.b.iv., the use of the word "murder" when questioning these witnesses did not render Goldberg's trial fundamentally unfair because there is significant evidence of his guilt.  See Young, 470 U.S. at 19.

Therefore, even if the prosecutor improperly used the word "murder" when

United States District Court
Northern District of California

1  questioning these witnesses, the Court of Appeal was not unreasonable in concluding that

2  it did not cumulatively prejudice Goldberg.  <u>See</u> Court of Appeal Opinion at 11.

3         Although the prosecutor also used the word "murder" when questioning a witness

4  about their call to the district attorney's office, the Court is barred from assessing the

5  merits of this alleged misconduct because the Court of Appeal found it procedurally

6  defaulted.  <u>See</u> Court of Appeal Opinion at 6–7 ("[W]hile the prosecutor did ask a witness

7  about his call to [the district attorney] regarding a 'murder,' Goldberg's counsel failed to

8  object."), 11 ("[E]ven if the prosecutor erred by describing Smith's killing as a 'murder,' . .

9  . we find no cumulative prejudice because Goldberg failed to preserve the issues by

10  objecting."); <u>see also</u>  <u>Coleman</u>, 501 U.S. at 729–30.  Thus, the Court cannot consider

11  whether the prosecutor's use of the word "murder" in this instance contributed to a

12  cumulative prejudicial error that deprived Goldberg of his rights to due process and a fair

13  trial.  <u>See</u> <u>Coleman</u>, 501 U.S. at 729–30.

14              **(ii)    Closing Arguments**

15         The Court next addresses Goldberg's assertion that the prosecutor's use of the word

16  "murder" dozens of times during his closing argument helped render Goldberg's trial

17  fundamentally unfair.  Pet. at 11.  Although the Court understands this alleged instance of

18  prosecutorial misconduct to be procedurally barred on federal habeas review,[5] the Court

19  will review Goldberg's claim <u>de novo</u> out of an abundance of caution.[6]

20         In his federal habeas petition, Goldberg argues that the prosecutor's use of the word

21  "murder" during his closing argument contributed to the deprivation of his due process

22

---

23  [5]  Goldberg's counsel failed to object to the prosecutor's use of the word "murder" during closing
     arguments.  Court of Appeal Opinion at 7.  On appeal, Goldberg brought an ineffective assistance

24  of counsel claim to overcome procedural default.  <u>See id.</u>  After denying Goldberg's ineffective
     assistance of counsel claim for lack of prejudice, the Court of Appeal implicitly held that Goldberg

25  had indeed defaulted on this claim for failing to object.  <u>See id.</u> at 7–8, 11.  Goldberg neither
     renews his ineffective assistance of counsel claim nor contests the Court of Appeal's analysis

26  thereof in his federal habeas petition.  <u>See</u> Pet.
     [6]  The Court reviews the prosecutor's use of the word "murder" during closing arguments <u>de novo</u>

27  because the Court of Appeal appears only to have addressed the merits of Goldberg's ineffective
     assistance of counsel claim in its opinion.  <u>See</u> Court of Appeal Opinion at 7–8; <u>see also</u> <u>Pirtle</u>,

28  313 F.3d at 1167–68 (establishing that federal courts must review a petitioner's claim on the
     merits where the state courts never reached the merits of the claim).

rights because it was improper under California law.  Pet. at 11.  Indeed, it is improper for a prosecutor to use the word "murder in questioning a witness about an unadjudicated killing."  Price, 821 F.2d at 703.  However, as other federal courts in this Circuit have noted, state courts typically do not find prejudice based on a prosecutor's use of the word "murder" at trial.  See Smith v. Campbell, 06-CV-2972-EMC, 2012 WL 1657169, at *24 (N.D. Cal. May 24, 2012) (listing cases); Velasco v. Montgomery, 17-CV-5678-JAK (JEM), 2019 WL 3021469, at *16 (C.D. Cal. Feb. 11, 2019) (citing id.), report and recommendation adopted, 17-CV-5678-JAK (JEM), 2019 WL 3017753 (C.D. Cal. July 10, 2019).  When a prosecutor's statements during closing argument are at issue, federal courts must judge them "in the context of the entire argument and the [court's] instructions."  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 898 (9th Cir. 1996) (a prosecutor's closing argument "must be judged in the context of the entire argument and the instructions").  Here, "the prosecutor used the term [murder] more than a dozen times when discussing the timeline of events and the evidence" during his closing argument.  Court of Appeal Opinion at 7; see Trial Tr. Vol. 6 at 1584–1600; Trial Tr. Vol. 7 (dkt. 16-2) at 1705–42.  However, even assuming that this was improper, it did not render Goldberg's trial so fundamentally unfair that it violated his due process rights.  See Darden, 477 U.S. at 181.

First, the trial court "took special pains to correct any impression" that the jury could consider the prosecutor's use of the word "murder" during his closing argument as evidence.  Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1964).  The trial court provided three admonitions during the prosecutor's closing argument, making clear that the jury should decide the case based on evidence, not attorneys' arguments.  See Trial Tr. Vol. 6 at 1542; Trial Tr. Vol. 7 at 1709, 1723–24.  The trial court also gave comprehensive instructions to the jury outlining both their fact-finding role and the requirements for a conviction.  See, e.g., Trial Tr. Vol. 6 at 1542 ("You must decide what the facts are in this case.  You must only use the evidence that was presented in this courtroom. . . . In their . . . closing arguments, the attorneys discuss the case[,] but their remarks are not evidence."), 1556–75 (explaining the requirements of conviction and self-defense).  The Court

19

presumes that the jury followed these instructions and that no due process violation occurred.  See Trillo, 769 F.3d at 1000; Darden 477 U.S. at 182.

Second, viewing the prosecutor's use of the word "murder" in light of the court's instructions and his entire closing argument, it appears that its effect on the jury was minimal.  See Ortiz-Sandoval, 81 F.3d at 898.  Although the prosecutor erred by using the word "murder" here, he also consistently used more appropriate terms like "shooting" or "killing" when referring to the events at issue.  See Trial Tr. Vol. 6 at 1584–1600; Trial Tr. Vol. 7 at 1705–42.  Additionally, the prosecutor's use of the word occurred throughout a lengthy closing argument.  See id.  Finally, the prosecutor himself also reminded the jury that it was their job to apply the law to the evidence in reaching a verdict.  See Trial Tr. Vol. 6 at 1584–85; Trial Tr. Vol. 7 at 1718.

Overall, considering the prosecutor's use of the word "murder" in the context of the court's curative instructions and the prosecutor's entire closing argument, this conduct— while ill-advised and improper—did not render Goldberg's trial fundamentally unfair.  See Ortiz-Sandoval, 81 F.3d at 898; Darden, 477 U.S. at 181–82.

* * *

The Court concludes that the prosecutor's use of the word "murder" when questioning witnesses and during his closing argument did not violate Goldberg's due process rights.  See Darden, 477 U.S. at 181–82.  To start, the Court of Appeal did not contradict or unreasonably apply federal law when it found no misconduct where the prosecutor used the word "murder" when questioning several witnesses.  See Court of Appeal Opinion at 6; see also 28 U.S.C. § 2254(d).  And even if the Court of Appeal determined that the prosecutor improperly used the word "murder" when questioning a separate witness about their call to the district attorney's office, see Court of Appeal Opinion at 6–7, the Court cannot consider this alleged instance of misconduct because it is procedurally defaulted.  See Coleman, 501 U.S. at 729–30.  Finally, although the prosecutor improperly used the word "murder" during his closing arguments, this impropriety did not render Goldberg's trial fundamentally unfair in violation of due

1   process.  See Pirtle, 313 F.3d at 1167–68; Darden, 477 U.S. at 181–82.

> ### iii.    The Prosecutor's Characterizations and Misstatements of Evidence

Goldberg argues that the Court of Appeal unreasonably concluded that the prosecutor's inaccurate characterizations and misstatements of evidence during trial did not violate his due process rights.  Pet. at 11.  Specifically, Goldberg takes issue with (1) the prosecutor's depiction, during closing arguments, of the victim's body as Goldberg fired the final shots and (2) the prosecutor's assertion that the victim was shot four times in the back.  Id. at 11–12.  According to Goldberg, these acts of alleged misconduct contributed to the cumulative error that deprived him of his rights to due process and a fair trial.  Id. at 13.  Respondent argues that the prosecutor's misstatements about the number of times the victim was shot are procedurally barred on federal habeas review, and even despite this procedural default, argues that the Court of Appeal reasonably denied both of Goldberg's claims on the merits.  See Answer at 8, 11.  Because the Court agrees that it cannot consider Goldberg's claim regarding the prosecutor's misstatements about the number of shots fired into Smith's back,[7] See Coleman, 501 U.S. at 729–30, the Court will only address the merits of the prosecutor's alleged mischaracterization of evidence.

Goldberg asserts that the Court of Appeal unreasonably determined that the prosecutor made a "reasonable inference" when he asserted during closing arguments that Goldberg fired his final shots after Smith had fallen to the ground.  Pet. at 12; see Court of

---

[7]  As explained in Part III.A.2.a, the Court of Appeal "clearly and expressly" found Goldberg's claim procedurally defaulted.  See Court of Appeal Opinion at 10 ("Goldberg did not object and thus failed to preserve the error for appeal."), 10 n.2 ("[B]y failing to object in trial court, Goldberg forfeited his claim that the prosecutor committed misconduct in implying when questioning Goldberg that Smith was shot four times in the back."), 11 ("Even if the prosecutor erred by . . . misstating the number of shots fired into Smith's back, we find no cumulative prejudice because Goldberg failed to preserve the issues by objecting.").  Although the Court of Appeal also considered the merits of Goldberg's claim, because it separately relied on a procedural bar, the claim is procedurally defaulted here.  See Loveland v. Hatcher, 231 F.3d 640, 643 (9th Cir. 2000) (holding that, when "reliance upon [the state court's] procedural bar rule was an independent and alternative basis for its denial of the petition, the review on the merits of the petitioner's federal constitutional claim in federal court is precluded.").  Therefore, the Court cannot consider the merits of the alleged effect of the prosecutor's misstatements about the number of shots fired into Goldberg's back.  See Coleman, 501 U.S. at 729–30.

United States District Court
Northern District of California

Appeal Opinion at 9.  A prosecutor's misleading and inflammatory arguments may violate a defendant's due process right to a fair trial.  <u>Darden</u>, 477 U.S. at 181–82.  However, "[p]rosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence."  <u>United States v. Henderson</u>, 241 F.3d 638, 652 (9th Cir. 2000).  Prosecutors are "free in argument to suggest that the jury draw reasonable inferences from the evidence presented at trial."  <u>United States v. Flores</u>, 802 F.3d 1028, 1035 (9th Cir. 2015).  Remarks that are "undesirable or even universally condemned" do not alone establish prosecutorial misconduct.  <u>Darden</u>, 477 U.S. at 181.

Here, the Court of Appeal reasonably determined that the prosecutor made a "reasonable inference" based on the evidence at trial when he asserted that the victim was on the ground as Goldberg fired the final shots.  <u>See id.</u>  Goldberg particularly criticizes the prosecutor's reenactment of the final moments of the shooting and his reliance on allegedly uncorroborated eyewitness testimony that described the victim as being on the ground at that time.  Pet. at 12.  However, as the Court of Appeal explained, the prosecutor's assertion was reasonable because the sole eyewitness of the shooting testified that he saw the victim "laying on the ground" and "the dust flying out from under him as the [final] bullets were going through."  <u>See</u> Court of Appeal Opinion at 9; Trial Tr. Vol. 2 at 468.  Although Goldberg questions the reliability of this account because "no bullets exited the victim's body," Pet. at 12, the Court of Appeal emphasized that even if the witness was incorrect about seeing dust, "the more important point is that [the witness] saw [the victim] laying on the ground while being shot."  Court of Appeal Opinion at 9.  Indeed, the Court of Appeal correctly pointed out that no one except Goldberg had contradicted the witness's testimony at trial.  <u>See id.</u>  On the contrary, the jury could have reasonably determined that other witnesses corroborated this account because they testified that they heard a pause between the first few shots and the final shots.  <u>See id.</u>; Trial Tr. Vol. 2 at 399, 436, 465–66, 488.

Although the Court of Appeal admitted that "evidence did not indicate the position of Smith's body when he was shot" and that Goldberg pointed to conflicting evidence as to

the source of the dust, a review of the record reveals that the prosecutor made a fair inference based on the evidence presented at trial.  See Court of Appeal Opinion at 9.  As the Court of Appeal explained, the evidence showed that Smith had bruising on his upper left chest and his upper left arm, as well as two bullet entry points on his back.  See id.; Trial Tr. Vol. 4 at 850–52.  In addition, the Court of Appeal also determined that other witnesses corroborated the eyewitness's testimony because they heard a pause after the first or the second shots but before Goldberg fired the last shots.  Court of Appeal at 9; see also Trial Tr. Vol. 2 at 399, 436, 465–66, 488.

Even if the prosecutor's actions constituted misconduct, his assertion that Smith was on the ground as Goldberg fired his final shots did not render Goldberg's trial fundamentally unfair.  See Darden, 477 U.S. at 181–82.  As discussed above, the weight of the evidence—including witness testimony and physical evidence—supported a guilty verdict.  See Young, 470 U.S. at 19.  Although defense counsel did not have an opportunity to respond to the assertions regarding Smith's body position that the prosecutor made in his rebuttal, see Trial Tr. Vol. 7 at 1721, 1723, defense counsel previously stated that there was "no evidence of any shots on the ground" during the defense's closing argument.  See Trial Tr. Vol. 6 at 1627; see also Trillo, 769 F.3d at 1001 (reviewing courts may examine whether defense counsel had the opportunity to rebut offending comments).  Defense counsel also disputed the eyewitness's version of events, which placed Smith on the ground as Goldberg fired his last shots at closing.  Trial Tr. Vol. 7 at 1655–56.  While the evidence concerning Smith's position when the final shots hit him is not clear, as the Court of Appeal noted, "[i]t was a matter for the jury to decide whether the [prosecutor's] inference was faulty or illogical."  Court of Appeal Opinion at 9 (quoting People v. Tully, 282 P.3d 173, 241–42 (Cal. 2012)).  Additionally, because the prosecutor's assertion was based on witness testimony and physical evidence from the record, the prosecutor did not misstate the facts of this case.  See, e.g., id. at 1723; see also Darden, 477 U.S. at 182.  The trial court also instructed the jury that "nothing the attorneys say is evidence in this case" immediately after the prosecutor indicated that Smith was

"probably" on the ground as "[Goldberg] shot those additional rounds."  Trial Tr. Vol. 7 at 1723–24; see also United States v. Barragan, 871 F.3d 689, 709 (9th Cir. 2017) (explaining that a curative instruction can mitigate any risk of prejudice if the instruction immediately follows and focuses upon a prosecutor's improper remarks at closing).

Accordingly, considered in context, the prosecutor's assertion that Smith was lying on the ground as Goldberg fired his final shots did not render Goldberg's trial fundamentally unfair in violation of due process.  See Darden, 477 U.S. at 181–82.

The Court therefore concludes that the Court of Appeal's rejection of Goldberg's prosecutorial misconduct claim regarding the prosecutor's alleged mischaracterization of the victim's body position as Goldberg fired the final shots was neither contrary to, nor an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d)(1). In addition, the Court is procedurally barred from considering whether the prosecutor's misstatements about the number of shots fired into Smith's back contributed to a cumulative error that deprived Goldberg of his rights to due process and a fair trial.  See Coleman, 501 U.S. at 729–30.

### iv.    Cumulative Prosecutorial Error

Goldberg argues that the prosecutor's improper pre-verdict uses of the word "murder" and mischaracterizations of evidence cumulatively prejudicially violated his constitutional right to due process and a fair trial.  Pet. at 13–14.  According to Goldberg, these alleged errors had a substantial and injurious effect on the verdict because they "struck at the central disputed issue at trial: whether the nature of the shooting supported second-degree murder or was an act of self-defense."  Id. at 13.  The Court of Appeal determined that there was no cumulative prejudice against Goldberg because where the prosecutor engaged in improper conduct, "Goldberg failed to preserve the issues by objecting."  Court of Appeal Opinion at 14.  Respondent argues that the Court of Appeal's conclusion is reasonable, and that, if constitutional error occurred, Goldberg fails to show that it had a substantial and injurious effect on the verdict.  Answer at 13, 16.

Because Goldberg claims that the prosecutor's alleged instances of misconduct,

24

1   when considered together, both deprived him of his due process rights <u>and</u> prejudiced his

2   case, Pet. at 13–14, the Court will address the claims together.

3        In some cases, although no single trial error is sufficiently prejudicial to warrant

4   reversal, the cumulative effect of several errors may still prejudice a defendant so much

5   that his conviction must be overturned.  <u>See</u> <u>United States v. Preston</u>, 873 F.3d 829, 835

6   (9th Cir. 2017) (reversing conviction for aggravated sexual abuse of a child where multiple

7   errors unfairly bolstered the victim's credibility, defendant was portrayed as the "type of

8   person" who would molest a child, and the government's case hinged entirely on the

9   victim's credibility with little corroborative evidence).  "Under traditional due process

10  principles, cumulative error warrants habeas relief only where the errors have so infected

11  the trial with unfairness as to make the resulting conviction a denial of due process."  <u>Parle</u>

12  <u>v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007) (cleaned up).  "Such 'infection' occurs

13  where the combined effect of the errors had a 'substantial and injurious effect or influence

14  on the jury's verdict.'"  <u>Id.</u> at 933 (citing <u>Brecht</u>, 507 U.S. at 637)).

15       Cumulative error is more likely to be found prejudicial when the government's case

16  is weak.  <u>See</u> <u>United States v. Frederick</u>, 78 F.3d 1370, 1381 (9th Cir. 1996) (finding

17  prejudice resulting from cumulative effect of improper vouching by prosecutor, improper

18  comment by prosecutor about defense counsel, and improper admission of evidence

19  previously ruled inadmissible required reversal even though each error alone might not

20  have warranted reversal).  The Ninth Circuit has "granted habeas relief under the

21  cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless

22  errors, such that they amplify each other in relation to a key contested issue in [a] case."

23  <u>Ybarra v. McDaniel</u>, 656 F.3d 984, 1001 (9th Cir. 2011); <u>see</u> <u>Parle</u>, 505 F.3d at 934

24  (finding a cumulative error due process violation where all of the trial court errors created

25  a "unique and critical thread" that rendered the petitioner's defense "far less persuasive

26  than it might have been.") (quoting <u>Chambers</u>, 410 U.S. at 294)).

27       However, "[i]f the evidence of guilt is otherwise overwhelming" and "the errors are

28  considered harmless," courts will generally affirm a conviction.  <u>Parle</u>, 505 F.3d at 928.

United States District Court
Northern District of California

United States District Court
Northern District of California

To determine whether constitutional errors of the trial type are harmless on federal habeas review, courts must review the record "as a whole," determine the relative harm caused by the errors, and ascertain whether they "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637–38.

Where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. See Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011). Similarly, there can be no cumulative error when there has not been more than one error. United States v. Solorio, 669 F.3d 943, 956 (9th Cir. 2012).

The Court proceeds as follows. First, the Court will address the issue of the Court of Appeal's implicit determination that there are no constitutional errors to accumulate into a cumulative deprivation of due process or prejudicial effect. See Court of Appeal Opinion at 11; see also Hayes, 632 F.3d at 524. Second, the Court will determine whether the prosecutorial errors in this case, if any, rendered Goldberg's trial fundamentally unfair. See Parle, 505 F.3d at 927. Third, the Court will review the record as a whole and consider whether cumulative prosecutorial error prejudiced Goldberg and, therefore, warrants habeas relief. See Brecht, 507 U.S. at 637–38. Ultimately, the Court concludes that Goldberg fails to show that the prosecutor's actions in this case, in combination, rendered Goldberg's trial fundamentally unfair or had a substantial or injurious effect on the verdict. See Parle, 505 F.3d at 927; Brecht, 507 U.S. at 637. The Court of Appeal reasonably concluded that there were no errors to accumulate. See Court of Appeal Opinion at 11; see also Hayes, 632 F.3d at 524.

As discussed above, the Court of Appeal held that several of the prosecutor's alleged acts of misconduct were not improper; rather, many of the prosecutor's statements were justified by the evidence in this case. See Court of Appeal Opinion at 6, 9. The prosecutor's use of the word "murder" when questioning Steve S. and Goldberg was not improper because the prosecutor merely repeated their use of the word in their statements and testimonies. See Court of Appeal Opinion at 6; Trial Tr. Vol. 4 at 894–95; Trial Tr. Vol. 6 at 1440–41. The prosecutor also did not commit misconduct when two additional

witnesses used the word "murder" to respond to the prosecutor's questions.  See Court of Appeal Opinion at 6; Trial Tr. Vol. 2 at 311, 598.  In addition, the prosecutor did not improperly assert at closing arguments that Smith was on the ground when Goldberg fired the final shots, because the prosecutor made a reasonable inference from the evidence presented at trial, including eyewitness testimony that placed Smith on his back, a report showing that Goldberg's initial shots were fatal, and bruising on Smith's chest and upper arm.  See Court of Appeal Opinion at 9; Trial Tr. Vol. 2 at 468; Trial Tr. Vol. 4 at 849–52.  Even if forensic evidence contradicted the witness's testimony about dust blowing from bullets exiting Smith's body, only Goldberg's statements contradicted the fact that the witness saw Smith on the ground while being shot.  See Court of Appeal Opinion at 9.

The Court of Appeal also found three instances in which the prosecutor did use improper statements—(1) the prosecutor's use of the word "murder" when questioning a witness about their call to the district attorney; (2) the prosecutor's repeated use of the word "murder" during closing arguments; and (3) the prosecutor's misstatements about the number of times Goldberg shot Smith in the back when questioning Goldberg and during closing arguments—procedurally defaulted.  See Court of Appeal Opinion at 6–8, 10, 10 n.2, 11.

Given that all of the alleged instances of prosecutorial misconduct in Goldberg's federal habeas petition either do not constitute misconduct or are barred on federal habeas review, see Coleman, 501 U.S. at 729–30, there are no errors to accumulate to establish a cumulative due process violation or prejudice to Goldberg.  See Hayes, 632 F.3d at 524.  Thus, the Court of Appeal neither contradicted nor unreasonably applied federal law in finding no cumulative prejudice.  See Court of Appeal Opinion at 11; see also 28 U.S.C. § 2254(d)(1).

However, even if there are prosecutorial errors to accumulate,[8] Goldberg has not

---

[8]  The Court cannot accumulate Goldberg's allegations regarding the prosecutor's use of the word "murder" when asking a witness about their call to the district attorney or the prosecutor's misstatements about the number of times Smith was shot in the back due to procedural default.  See Court of Appeal Opinion at 6, 10, 10 n.2, 11; see also Coleman, 501 U.S. at 729–30.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  shown that, in combination, the errors rendered his trial fundamentally unfair.  See Parle,

2  505 F.3d at 927.  Goldberg argues that the prosecutor's improper and "thematic" use of the

3  word "murder" and "misuse" of the witness testimony that placed Smith on the ground as

4  Goldberg fired his last shots each affected the heart of the key issue at trial: whether the

5  shooting constituted second-degree murder or self-defense.  See Pet. at 13–14.  To be sure,

6  the prosecutor's conduct was not perfect, but the Court finds no "symmetry of error" that

7  warrants reversal.  See Ybarra, 656 F.3d at 1001.

8      The prosecution's case was substantial and multifaceted, relying on testimony from

9  several witnesses (including an eyewitness) and forensic evidence.  See, e.g., Trial Tr. Vol.

10  2 at 472 (a witness testified that he saw dust blowing as Smith was shot while on the

11  ground); Trial Tr. Vol. 3 at 635 (a witness remembered Goldberg saying, "I'm going to kill

12  that motherfucker."); Trial Tr. Vol. 4 at 844, 848–51 (Goldberg shot Smith five times;

13  three times in the chest, two times in the back); Trial Tr. Vol. 5 at 1220–21 (a witness

14  testified that Goldberg initially said that his first shot was accidental but did not know why

15  he pulled the trigger several more times).

16      Goldberg is correct that the prosecutor's use of the word "murder" and arguments

17  concerning Smith's body position as he was being shot each touch on the issue of whether

18  the shooting constituted second-degree murder or self-defense.  See Pet. at 13–14.

19  However, these alleged instances of misconduct did not amplify each other or create a

20  unique synergistic effect.  See Parle, 505 F.3d at 933.  For example, the claimed error

21  concerning the prosecution's use of the word "murder" when questioning Steve S. and

22  Goldberg about Steve S.'s prior statements did not suggest the validity of the prosecutor's

23  argument that Smith was on the ground when Goldberg fired his final shots.  See Trial Tr.

24  

_____

25  Although the Court of Appeal also found Goldberg's allegations concerning the prosecutor's use
   of the word "murder" during closing arguments procedurally defaulted, the Court will consider the

26  merits of this allegation in case it is not barred on federal review.  See Court of Appeal Opinion at
   7–8, 11; see also Zapata 788 F.3d at 1111–12.  Therefore, assuming arguendo that prosecutorial

27  error exists, such errors may include: (1) the prosecutor's use of the word "murder" when
   questioning Steve S., Goldberg, and two additional witnesses; (2) the prosecutor's use of the word

28  "murder" during closing arguments; and (3) the prosecutor's assertion that Smith was laying on
   the ground as Goldberg fired his final shots.  See Court of Appeal Opinion at 6–9.

United States District Court
Northern District of California

Vol. 2 at 468; Trial Tr. Vol. 4 at 894–95; Trial Tr. Vol. 6 at 1440–41.  The trial court also mitigated any effects of the prosecutor's use of the word "murder" during his closing argument and the prosecutor's assertion that Smith was on the ground when Goldberg fired his final shots by repeatedly providing admonitions and instructions advising the jury that the attorneys' remarks are not evidence.  See Trial Tr. Vol. 6 at 1542, 1556–75; Trial Tr. Vol. 7 at 1709, 1723–24.  The Court presumes that the jury followed these instructions.  See Trillo, 769 F.3d at 1000.  The prosecutor also mitigated the effect of his use of the word "murder" during his closing argument by consistently using more neutral terms like "killing" and "shooting," and reminding the jury that it was their job to apply the law to the evidence in reaching their verdict.  See Trial Tr. Vol. 6 at 1584–1600; Trial Tr. Vol. 7 at 1705–42.

Similarly, the assumed errors did not render Goldberg's defense "far less persuasive than it might [otherwise] have been."  See Parle, 505 F.3d at 927–28.  Goldberg argues that the prosecutor improperly relied on eyewitness testimony that contradicted forensic evidence to argue that Smith was on the ground when Goldberg fired his last shots, which was central to disproving his self-defense theory.  Pet. at 13–14.  However, Goldberg's counsel was not prevented from arguing self-defense at trial.  See Ybarra, 656 F.3d at 1001 (finding no "unique symmetry of error" where "the defense was not prevented from presenting counterbalancing arguments").  In fact, Goldberg's counsel did assert a self-defense theory and contested the issue of whether Smith was on the ground as Goldberg shot him.  See Trial Tr. Vol. 6 at 1627 (stating that there was "no evidence of any shots on the ground" at closing arguments); Trial Tr. Vol. 7 at 1655–56 (pointing to a potential alternative source of the dust the eyewitness saw flying out from under Smith while he was shot), 1688–93 (summarizing Goldberg's self-defense theory during defense counsel's closing argument).  Goldberg also presented evidence in support of his self-defense theory.  Court of Appeal Opinion at 3.  As the Court of Appeal concluded, "[a]lthough Goldberg points to conflicting evidence" concerning whether Smith was on the ground when Goldberg fired his final shots, a combination of errors did not inhibit the jury's ability to

29

United States District Court
Northern District of California

1  determine whether the evidence supported second-degree murder or self-defense.  See

2  Court of Appeal Opinion at 9; cf. Parle, 505 F.3d at 930 (concluding that cumulative trial

3  errors rendered a petitioner's defense far less persuasive where "all of the improperly

4  excluded evidence . . . supported [the defendant's] defense that he had the requisite state of

5  mind for first-degree murder . . . all of the erroneously admitted evidence . . . undermined

6  [his] defense and credibility and bolstered the State's case.") (emphasis in original).

7        Accordingly, the Court finds that the prosecutorial errors in this case, even when

8  considered in combination, did not render Goldberg's defense "far less persuasive" or

9  infect his trial with so much unfairness as to deprive him of due process.  See Ybarra, 656

10  F.3d at 1001.

11       Finally, the Court declines to hold that any of Goldberg's claims of cumulative

12  prosecutorial error caused prejudice that had a substantial or injurious effect on the verdict.

13  See Brecht, 507 U.S. at 637.  As Respondent argues, "the evidence that [Goldberg]

14  murdered the victim rather than shot him in self-defense was strong."  Answer at 13; see

15  Parle, 505 F.3d at 928 (establishing that "if the evidence of guilt is otherwise

16  overwhelming" and "the errors are considered harmless," courts generally affirm

17  convictions).

18       There was ample evidence to establish that Goldberg planned, prepared, and

19  intended to kill Smith, including witness testimony indicating that Goldberg was "irate"

20  after learning of his wife's affair with Smith, Trial Tr. Vol. 2 at 303–04; Goldberg's

21  testimony that he shot his firearm at a tree that he used for target practice the morning of

22  the shooting and reloaded it and placed it in his van, Trial Tr. Vol. 5 at 1341–42; witness

23  testimony establishing that Goldberg said that he "was going to kill that motherfucker" in

24  reference to Smith, Trial Tr. Vol. 3 at 624; and witness testimony from road crew members

25  who saw Goldberg driving slowly back and forth in front of Smith's house before the

26  shooting, Trial Tr. Vol. 2 at 407–08, 423, 429.  A witness also testified that Goldberg said,

27  "I thought you were my friend," shortly before he began shooting Smith.  Trial Tr. Vol. 1

28  (dkt. 15) at 143.  Other witnesses heard a pause between Goldberg's initial shots and the

United States District Court
Northern District of California

1   rest of the shots, Trial Tr. Vol. 2 at 399, 436, 465–66, 488, and an eyewitness testified that

2   he saw Smith on the ground as he was shot, and that dust flew out from under him with

3   each round.  Id. at 468, 472, 476.  Although Goldberg's counsel pointed to conflicting

4   evidence as to the source of the dust, only Goldberg's testimony contradicted the fact that

5   the eyewitness saw Smith on the ground as he was being shot.  See Court of Appeal

6   Opinion at 9; Trial Tr. Vol. 7 at 1655–56.  Forensic evidence established that Goldberg

7   shot Smith five times, four of which were fatal, and two of which were in the back.  Trial

8   Tr. Vol. 4 at 844, 848–51.

9         Goldberg's actions following the shooting also support a murder conviction.

10  Witnesses testified that Goldberg fled the scene immediately following the shooting and

11  later abandoned his vehicle.  Trial Tr. Vol. 2 at 340, 390–93; Trial Tr. Vol. 4 at 896–97.

12  Witness Steve S. testified that Goldberg had told him and Goldberg's mother that he had

13  just shot someone.  Trial Tr. Vol. 4 at 894–95, 900–01, 1047.  In addition, Goldberg

14  initially told the defense psychologist that his first shot at Smith was an accident and that

15  he did not know why he continued firing.  Trial Tr. Vol. 5 at 1220–21.

16        Because the record establishes that there was substantial evidence that Goldberg

17  committed second-degree murder, the prosecutor's alleged acts of misconduct, taken

18  together, did not "substantially or injuriously [a]ffect the verdict" to prejudice Goldberg.

19  See Parle, 505 F.3d at 928; Brecht, 507 U.S. at 637–38.

20        Therefore, even if there are prosecutorial errors to accumulate in this case, Goldberg

21  is not entitled to relief based on cumulative effect because the alleged, non-barred

22  instances of misconduct neither rendered his trial fundamentally unfair nor substantially or

23  injuriously affected the verdict.  See Parle, 505 F.3d at 927–28; Brecht 507 at 637–38.

24                    **3.    Summary as to Procedural Misconduct**

25        For the reasons above, the Court of Appeal's rejection of Goldberg's individual and

26  cumulative prosecutorial misconduct claims was not contrary to, or an unreasonable

27  application of, clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d)(1).

28  The Court of Appeal also did not base its conclusion on an unreasonable determination of

31

1   the facts.  See id. § 2254(d)(2).  Rather, the Court of Appeal reasonably concluded that the

2   prosecutor's pre-verdict use of the word "murder" and misstatements and

3   mischaracterizations of evidence did not violate Goldberg's due process rights by

4   rendering his trial fundamentally unfair, see Darden, 477 U.S. at 181, or prejudice him see

5   Brecht, 507 U.S. at 637.  Goldberg is not entitled to federal habeas relief on the basis of

6   prosecutorial misconduct.

### B.   Juror Misconduct

Goldberg claims that he was denied his Sixth and Fourteenth Amendment rights to

an impartial jury when two jurors discussed sentencing during their deliberations.  Pet. at

14–17.  As explained below, the Court concludes that the California Court of Appeal

reasonably rejected Goldberg's claim.

### 1.   Court of Appeal Opinion

The Court of Appeal summarized the factual background for Goldberg's juror

misconduct claim as follows:

> First, we summarize relevant information from juror
> declarations that Goldberg submitted in support of his motion
> for a new trial as well as juror testimony taken as part of the
> trial court's inquiry on juror misconduct, excluding
> information barred by Evidence Code section 1150 relating to
> juror's mental processes and subjective reasoning.  (People v.
> Cox (1991) 53 Cal. 3d 618, 694, overruled on other grounds in
> People v. Doolin (2009) 45 Cal. 4th 390, 421; People v. Danks
> (2005) 32 Cal. 4th 269, 302 (Danks); Evid. Code, § 1150.)
>
> The controversy stems from a brief exchange between
> Juror No. 3 and Juror No. 11.  During deliberations, Juror No.
> 3 stated she could not give Goldberg a 20-year sentence
> because he was too young.  Juror No. 11, the foreperson, said
> that in a previous trial for which he was a juror, "the defendant
> got eight years for murder one," and "in our California system
> people serve half of their time."  Juror No. 8 recalled that
> several jurors other than Juror No. 11 said that sentencing was
> the judge's job, not the jury's.  Juror No. 11 was "sure" he did
> not mention Goldberg's name in commenting about
> sentencing.
>
> According to several jurors, the sentencing discussion
> was short, comprised of three or four sentences, and occurred
> "just in passing."  Two jurors (Nos. 5 and 10) did not hear or
> could not recall any discussion of sentencing.  Juror No. 3
> explained, "That was just an aside, the whole penalty thing . . .

[I]t was somewhat chaotic.  There were . . . discussions going on all around the room."  "[P]eople were getting coffee and kind of moving around the room[.]"

The sentencing comment occurred part way, possibly midway, or as much as three-quarters through the deliberations but not at the end.  According to Juror No. 12, the jury continued to discuss manslaughter "towards the end of the deliberations."  Juror No. 11 testified that the jury spent the rest of the time "talking about what charges the evidence proved."  Juror Nos. 1, 12, and 4 confirmed that the deliberations focused on the factors necessary to prove the charges.  According to Juror No. 1, sentencing "was not discussed to reach one verdict or another."

The trial court found that Juror No. 11—the foreperson—was a credible witness and that Juror No. 3 was not credible, and Goldberg does not persuade us that these findings are unsupported.  (In re Manriquez (2018) 5 Cal. 5th 785, 804 [assuming trial court considered juror's inconsistent statements and demeanor when making credibility findings].)

Court of Appeal Opinion at 12–13.  The Court of Appeal rejected Goldberg's juror misconduct claim as follows:

Goldberg next challenges the trial court's denial of his motion for a new trial based on juror misconduct.  We determine de novo whether any misconduct prejudiced the defendant (People v. Caro (2019) 7 Cal. 5th 463, 521 (Caro); see also People v. Miles (2020) 9 Cal. 5th 513, 602 (Miles)) and conclude that there was no substantial likelihood that Goldberg suffered prejudice from juror misconduct.

. . . .

Goldberg's first claim of misconduct concerns jurors who briefly discussed sentencing during deliberations.  (People v. Allison (1989) 48 Cal. 3d 879, 892 ["A defendant's possible punishment is not a proper matter for the jury's consideration in determining guilt or innocence."].)

. . . .

Juror misconduct gives rise to a presumption of prejudice.  (In re Boyette (2013) 56 Cal. 4th 866, 892 (Boyette).)  "The presumption of prejudice may be rebutted by an affirmative evidentiary showing 'or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct.'" (In re Carpenter (1995) 9 Cal. 4th 634, 657 (Carpenter); see also Caro, supra, 7 Cal. 5th at p. 521.)

United States District Court
Northern District of California

33

When the misconduct concerns information about a party or case from extraneous sources, we apply a two-prong test to determine whether a substantial likelihood of juror bias exists: (1) is the extraneous material, judged objectively, so prejudicial that it is inherently likely to have influenced a juror; or (2) even if the information is not inherently prejudicial, is it substantially likely a juror was " 'actually biased' " against the defendant?  (Boyette, supra, 56 Cal. 4th at p. 891; see also Miles, supra, 9 Cal. 5th at p. 601.)  If the court finds a substantial likelihood of bias under either prong, the verdict will be set aside.  (Carpenter, supra, 9 Cal. 4th at p. 655; see also Miles, supra, 9 Cal. 5th at p. 601.)

. . . .

Applying the first prong of the test, we conclude the discussion was not " 'so prejudicial in and of itself that it [wa]s inherently and substantially likely to have influenced a juror[.]' "  (Boyette, supra, 56 Cal. 4th at p. 891.)

First, the sentencing discussion was not particularly inflammatory.  (See Miles, supra, 9 Cal. 5th at p. 602 [considering the nature of extrinsic information and whether it was "inflammatory" in determining whether it was "inherently and substantially likely to have influenced a juror"].)  As detailed above, Jurors No. 3 and 11 discussed the possible length of the sentence part way through deliberations.  While the sentencing discussion was irrelevant and contained erroneous information, it was quite brief, and sentencing "was not discussed to reach one verdict or another."  Further, it was immediately followed by admonitions that the jury may not consider sentencing.  As our Supreme Court has observed, "speculation concerning punishment" is "an inevitable feature of the jury system."  (Dykes, supra, 46 Cal. 4th at p. 812.)  The brief consideration of sentencing by a jury may be cured and need not require reversal of the judgment.  (See, e.g., People v. Loker (2008) 44 al. 4th 691, 750 (Loker) ["it was improper for the jurors to discuss the costs of punishment, but . . . the misconduct [was] not prejudicial because the discussion was brief and was met with an admonition from the foreperson"]; People v. Leonard (2007) 40 Cal. 4th 1370, 1426 (Leonard) [jury's discussion of the costs of life imprisonment was harmless where foreperson reminded the jury this was not an appropriate consideration].)

Second, in the context of the trial record here, the discussion was unlikely to have made a difference.  (Carpenter, supra, 9 Cal. 4th at p. 654; see also id. ["[T]he stronger the evidence, the less likely it is that the extraneous information itself influenced the verdict."].)  There was overwhelming evidence supporting a second-degree murder conviction based on implied, if not express, malice.  (See People v. Watson (1981) 30 Cal. 3d 290, 296.)  Angry at Smith for sleeping with his wife, Goldberg told his neighbor Chad H. he was going to "kill that motherfucker."  Minutes later, he took his loaded pistol—which he had used earlier that morning for target

practice—and drove to Smith's house.  He recognized Smith's truck, saw him emerge from the house, and confronted him on the driveway.  After telling Smith "I thought you were my friend," he shot him five times, twice in the back.

While the evidence of Goldberg's guilt was overwhelming, his self-defense and imperfect self-defense arguments were comparatively weak.  Goldberg never offered a plausible explanation for arming himself with a gun when he exited his van: although he testified he was fearful of Smith, there was no evidence that Smith bore him animosity.  To the contrary, Goldberg was the one who was angry, and he chose to confront Smith with a loaded revolver when he could have simply driven away.  (See People v. Eulian (2016) 247 Cal. App. 4th 1324, 1332–1333 [no right to self-defense if defendant provoked fight as an excuse to use force].)  Moreover, Goldberg's self-defense arguments were based largely on his own testimony that he feared for his life when Smith grabbed his wrist.  It is undisputed, however, that Smith was unarmed, and the only independent witness who saw the shooting said that Smith was on the ground while Goldberg continued firing at him.

Goldberg's heat-of-passion argument was similarly tenuous.  Heat of passion is a state of mind that reduces the defendant's culpability for an unlawful killing if, " ' "at the time of the killing, the reason for the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflections, and from such passion rather than from judgment." ' "  (People v. Beltran (2013) 56 Cal. 4th 935, 942; see also People v. Nelson (2016) 1 Cal. 5th 513, 538–539.)  Goldberg asserts that he was distraught after learning of Smith's affair with his wife, he had had no time to cool off, and therefore in shooting Smith he reacted " ' " ' from a passion rather than from judgment.' " ' "  However, this argument contradicted his testimony that he shot Smith because his gun discharged accidentally and he believed his life was in danger, rather than because he was angry or jealous toward Smith.  He further undermined this argument by testifying that shortly before the shooting, he went on a mundane errand to get a new phone at the Verizon store, a 50-minute drive each way.  (See 1 Witkin, Cal. Crim. Law (4th Ed. 2020), Ch. IV, § 239 ["circumstantial evidence [such] as rational conversation, transaction of other business, or preparation for the killing" may show that defendant's passions cooled], citing People v. Golsh (1923) 63 Cal. App. 609, 617.)

We conclude the discussion was not "inherently and substantially likely" to have made a difference in the verdict. (See Danks, supra, 32 Cal. 4th at p. 305 ["the likelihood of bias under the inherent prejudice test 'must be substantial.'"].)

People v. Echavarria (2017) 13 Cal. App. 5th 1255, relied upon by Goldberg, is unavailing.  That case was close, the evidence of premeditation was slim, and the jury's

United States District Court
Northern District of California

discussion of sentencing was more substantial.  (Id. at pp. 1263, 1267–1268, 1270–1271.)

. . . .

Neither do we find prejudice under the second prong of the test, which asks whether there is a substantial likelihood that a juror was actually biased, based on a review of the entire record.  (See Boyette, supra, 56 Cal. 4th at p. 883; Carpenter, supra, 9 Cal. 4th at p. 654.)  Goldberg argues that the record indicates two jurors changed their votes from manslaughter to second degree murder at some point after the sentencing discussion.

However, one of those jurors was Juror No. 10, who did not even recall that sentencing was discussed.

With respect to the other juror, Juror No. 3, Goldberg relies primarily on statements of her mental processes that are barred under Evidence Code section 1150.  (Cox, supra, 53 Cal. 3d at p. 694.)  In any event, as noted, the trial court reasonably concluded that Juror No. 3 was not credible.  Her statements were inconsistent, but she herself suggested that the sentencing discussion was inconsequential: "That was just an aside, the whole penalty thing."  She described it as a "comment" or "interjection" as "people were getting coffee and kind of moving around the room."

Finally, the evidence does not suggest any other juror was likely to have been actually biased by the sentencing discussion.  Although Juror No. 11 commented on sentencing, he testified that he did so in response to Juror No. 3 raising the issue.  Moreover, the brief discussion was immediately followed by juror admonitions that they should not consider sentencing.  (People v. Pinholster (1992) 1 Cal. 4th 865, 925 ["The presumption of prejudice may be dispelled by an admonition to disregard the improper information."], disapproved of on other grounds by People v. Williams (2010) 49 Cal. 4th 405, 459; Loker, supra, 44 Cal. 4th at p. 750; Leonard, supra, 40 Cal. 4th at p. 1426.)  The jury also received an instruction on this point, each received a personal copy of the instructions, and they read the instructions "very carefully several times."  The references to sentencing were brief and "in passing."  The vast majority of the jury's time was spent discussing the factors necessary to prove the charges and the evidence.  The jury did not discuss sentencing "to reach one verdict or another."  Further, even after the sentencing discussion, the jury continued to discuss manslaughter.

In sum, we conclude there was no substantial likelihood of juror bias stemming from the sentencing discussion.

Court of Appeal Opinion at 11–19.

United States District Court
Northern District of California

### 2.      Analysis

#### a.      Governing Law

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI; see Irwin v. Dowd, 366 U.S. 717, 722 (1961). The right to trial by jury "necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."  Turner v. Louisiana, 379 U.S. 466, 472–73 (1965).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."  Tinsley v. Borg, 895 F.2d 520, 523–24 (9th Cir. 1990) (internal quotation marks omitted).

The Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  "The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."  Id.  Due process therefore means "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  Id.

Evidence not presented at trial is deemed "extrinsic."  See Marino v. Vasquez, 812 F.2d 499, 504 (9th Cir. 1987).  A jury's consideration of extrinsic evidence constitutes trial error, not structural error.  Eslaminia v. White, 136 F.3d 1234, 1237 n.1 (9th Cir. 1998). Thus, on habeas review, the court must determine whether the error had a substantial and injurious effect on the verdict.  Henry v. Ryan, 720 F.3d 1073, 1085 (9th Cir. 2013).  Juror misconduct generally does not warrant a new trial where "the extraneous information the jury considered was not inherently inflammatory, nor had it already been excluded from trial as unduly prejudicial."  Henry, 720 F.3d at 1086.

#### b.      Merits

United States District Court
Northern District of California

1    Goldberg argues that the jury's sentencing discussion violated his Sixth

2    Amendment right to an impartial jury.  Pet. at 14–17.  Respondent counters that the Court

3    of Appeal's rejection of Goldberg's juror misconduct claim was neither contrary to, nor an

4    unreasonable application of, clearly established Supreme Court law.  Answer at 22–24.

5    The Court agrees with Respondent.

6    The Court of Appeal's discussion as to inherent prejudice was thorough and

7    persuasive.  The sentencing exchange between the two jurors was very brief, occurred

8    "part way, possibly midway, or as much as three-quarters through the deliberations but not

9    at the end," was "just in passing," and was immediately followed by jurors (including Juror

10   11, one of the two participants) reminding each other "that sentencing is the judge's

11   responsibility."  Court of Appeal Opinion at 12–13.  Moreover, as discussed in Part

12   III.A.2.b.iv., the trial record overwhelmingly established that Goldberg planned, prepared,

13   and intended to kill Smith, and it discredited Goldberg's self-defense and heat-of-passion

14   defenses, such that the sentencing exchange was not inherently likely to have influenced a

15   juror.

16   The Court of Appeal's discussion as to whether a juror was actually biased, based

17   on a review of the entire record, was also thorough and persuasive.  Goldberg argues that

18   the Court of Appeal did not consider how the sentencing discussion affected the jury and

19   its verdict in this case.  See Pet. at 17; Traverse at 4.  He correctly states that reviewing

20   courts should not consider "what effect the constitutional error might generally be

21   expected to have on a reasonable jury, but rather[,] what effect it had upon the guilty

22   verdict in the case at hand."  Traverse at 4 (quoting Sullivan v. Louisiana, 508 U.S. 275,

23   279 (1993)).  But the Court of Appeal's review was consistent with Sullivan.  The Court of

24   Appeal considered whether there was a substantial likelihood that any one of the jurors in

25   Goldberg's case was actually biased due to the sentencing exchange, and answered that

26   question in the negative based on the record.  See Court of Appeal Opinion at 18 .

27   Goldberg had argued that two jurors changed their votes from manslaughter to

28   second degree murder at some point, but one (Juror 10) did not recall that sentencing was

38

discussed, and the other was Juror No. 3.  Id.  The trial court "held a hearing on juror misconduct in which 10 jurors testified, and it determined that the presumption of prejudice arising from juror misconduct was rebutted." Id. at 5.  The trial court found that Juror No. 3 was not credible based on firsthand observations of Juror No. 3's testimony in that hearing.  Id. at 13, 18.  That credibility determination is entitled to great deference.  See Skilling v. United States, 561 U.S. 358, 396 (2010) (in reviewing juror bias claims, "the deference due to district courts is at its pinnacle").  Goldberg has failed to establish that the "state court's credibility findings . . . were unreasonable," see Traverse at 3, or that the Court of Appeal was unreasonable in its deference to the trial court's credibility determination.

The Court of Appeal also noted that even Juror No. 3 "suggested that the sentencing discussion was inconsequential: 'That was just an aside, the whole penalty thing.'  She described it as a 'comment' or 'interjection' that was not 'meant to be part of the deliberation because, . . . people were getting coffee and kind of moving around the room.'"  Court of Appeal Opinion at 18.  It also observed that no other juror was likely actually biased based on the discussion, that the sentencing exchange "was immediately followed by juror admonitions that they should not consider sentencing," that the trial court instructed the jury on this point, and that the jurors read the instructions "very carefully several times." Id. at 18–19; see also CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841 (2009) ("[J]uries are presumed to follow the court's instructions.").  This discussion demonstrates that the Court of Appeals was appropriately focused on what effect the sentencing exchange had on the guilty verdict in this case.

Although Goldberg urges the Court to consider Juror No. 3's statements in her declaration concerning her thought processes during deliberations, Pet. at 14–15, the Court cannot consider those statements.  "[C]ourts may not inquire about the subjective impact of [juror] misconduct on the jury."  Henry, 720 F.3d at 1087 (citing Fed. R. Evid. 606(b)); see also Fields v. Brown, 503 F.3d 755, 778 (9th Cir. 2007) ("juror testimony about the subjective effect of evidence on the particular juror or about the deliberative

United States District Court
Northern District of California

process may not [be considered]."); Traverse at 3 ("It is true that Federal Rule of Evidence 606(b) and California Evidence Code § 1150 make a juror's testimony about his or her subjective beliefs inadmissible.").  Goldberg's assertion that the foreperson's testimony is sufficient to bring Juror No. 3's subjective thoughts into consideration, see Traverse at 3–4, even if true, but see Fed. R. Evid. 606(b)(1) ("a juror may not testify about . . . the effect of anything on that juror's or another juror's vote"), does not persuade the Court that the Court of Appeal unreasonably applied federal law in deferring to the trial court's credibility determination, or in concluding in light of the entire record that the sentencing exchange did not actually bias any juror.  See Skilling, 561 U.S. at 387–87 ("Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record."); Hedlund v. Ryan, 815 F.3d 1233, 1248 (9th Cir. 2016), amended and superseded on denial of rehearing en banc by 854 F.3d 557 (9th Cir. 2017) (state court bias findings are presumptively correct).  The Court concludes that the sentencing exchange did not have a substantial and injurious effect on the verdict.  See Henry, 720 F.3d at 1085.

Accordingly, the Court of Appeal's rejection of Goldberg's juror misconduct claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d)(1).  The Court of Appeal also did not base its conclusion on an unreasonable determination of the facts.  See id. § 2254(d)(2).  Rather, the Court of Appeal reasonably concluded that the sentencing exchange that two jurors had briefly during deliberations did not violate Goldberg's Sixth and Fourteenth Amendment rights to an impartial jury.  Goldberg is not entitled to federal habeas relief on the basis of juror misconduct.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Goldberg's habeas petition.[9]

---

[9]  Contrary to petitioner's suggestion, an evidentiary hearing is not necessary to resolve the claims.  See Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998).

A certificate of appealability is also DENIED.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.  Goldberg has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has he demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

**IT IS SO ORDERED.**

Dated: December  9  , 2022



CHARLES R. BREYER
United States District Judge